UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Kimberly McGee,<br><br>　　Plaintiff,<br><br>v.<br><br>I.Q. Data International, Inc.,<br><br>　　Defendant. | Case No.<br><br><br>**COMPLAINT FOR DAMAGES UNDER THE FAIR DEBT COLLECTION PRACTICES ACT AND OTHER EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

**PARTIES**

1. Plaintiff, Kimberly McGee ("Kimberly"), is a natural person who resided in Hillside, Illinois, at all times relevant to this action.

2. Defendant, I.Q. Data International, Inc. ("IQ"), is a Washington corporation that maintained its principal place of business in Everett, Washington, at all times relevant to this action.

**JURISDICTION AND VENUE**

3. Pursuant to 28 U.S.C. §1331, this Court has federal question jurisdiction over this matter as it arises under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.

4. Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to this claim occurred in this judicial district.

**STATEMENT OF FACTS**

5. At all times relevant to this action, IQ collected consumer debts.

6. IQ regularly uses instrumentalities of interstate commerce and the mails to collect consumer debts owed or due or asserted to be owed or due another.

1

7. The principal source of IQ's revenue is debt collection.

8. IQ is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

9. As described, *infra*, IQ contacted Kimberly to collect a debt that was incurred primarily for personal, family, or household purposes.

10. Kimberly is a "consumer" as defined by 15 U.S.C. § 1692a(3).

11. Kimberly, the Plaintiff in this case, is employed as a senior debt collection manager, with over 28 years of experience in the Accounts Receivable industry and takes great pride in her ability to help consumers find acceptable solutions to resolve their past due accounts.

12. Kimberly, the Plaintiff in this case, regularly trains her subordinates on ensuring FDCPA compliance for her employer.

13. This alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5).

14. Specifically, Kimberly was the obligor on a lease agreement with an apartment complex ("Apartment Complex") for a residential unit ("Apartment") for Kimberly's daughter ("Daughter").

15. On the date of occupancy, Kimberly arrived at the Apartment Complex and the Apartment was in a state of objective uninhabitability and was unfit for occupancy.

16. For example, there were water lines higher than the baseboards showing that the apartment had previously been flooded and not adequately remedied.

17. For example, there were large visible patches of mold growing throughout the Apartment including on the floor, walls and finishes.

18. As a result of the condition of the Apartment, Kimberly and Daughter became physically ill after spending just a few hours in the apartment.

19. Kimberly notified the Apartment Complex that the Apartment was not acceptable and supplied Apartment Complex with pictures of the Apartment.

20. Apartment Complex was unable to provide Kimberly with an acceptable alternative Apartment.

21. As a result of Apartment Complex's breach of the lease, Kimberly loaded the few items she had unpacked into a U-Haul and left the Apartment Complex.

22. Despite these facts, Apartment Complex, and IQ, are harassing, threatening and bombarding Kimberly to coerce payment for the lease that Apartment Complex breached.

23. Kimberly describes IQ's debt collection techniques as "Shocking" and "Horrendous" and "Illegal" based on her own experience in collecting debts and training collectors on how to comply with the FDCPA.

24. Within the past twelve months, IQ began reporting the debt on Kimberly's credit report.

25. Within the past twelve months, IQ began calling Kimberly and her family members in connection with the collection of a debt.

26. Within the past twelve months, IQ threatened and berated Kimberly during phone communications.

27. Within the past twelve months, on at least one occasion, IQ spoke with Daughter and disclosed to Daughter that Kimberly owed a debt.

28. On at least one occasion, IQ threatened Daughter and demanded Daughter pay the debt.

29. On at least one occasion, when Kimberly stated that she was going to hire an attorney, IQ warned Kimberly from seeking legal counsel and threatened her with an undesirable outcome if she sought legal advice.

30. Within the past twelve months, Kimberly has regularly disputed the debt with IQ and IQ's Agents and demanded that IQ notify the credit bureaus of her dispute.

31. Kimberly explained the nature of her dispute to IQ and explained that the apartment was uninhabitable.

32. In response to multiple disputes made by and on behalf of Kimberly, IQ never notified the credit bureaus that the tradeline it was furnishing was disputed.

33. Because of IQ's inaccurate tradeline furnishing, Kimberly has repeatedly been denied credit and has been denied necessary housing and shelter.

34. Additionally, IQ threatened that their derogatory reporting was going to appear on Kimberly's credit report until it was paid off and threatened Kimberly and Daughter that they would *never* be able to rent an apartment again.

35. The length of time IQ is permitted to report collection accounts on behalf of their clients is determined by factors other than IQ's desire and it is specifically unlawful to report collection accounts forever or until it is paid.

36. Even if IQ's tradeline reporting was accurate, it would not stay on Kimberly's and/or Daughter's credit forever and, therefore, would not negate their ability to rent an apartment "forever".

37. Kimberly's current residential lease expires in June 2021 and a new tenant has already signed a future lease to occupy the premises.

38. Because of IQ's debt collection tactics, Kimberly now faces the real possibility that she will be homeless.

39. Despite applying for alternative housing, because of IQ's inaccurate credit reporting, Kimberly's current apartment applications are being denied.

40. As a result of IQ's conduct, Kimberly feels despair, dread, fear, severe anxiety and has spent countless hours terrified about what will happen if she can't find somewhere to live when her current lease expires.

41. Moreover, Kimberly's father ("Father") recently suffered a stroke and is, himself, in need of suitable housing.

42. If not for IQ's conduct, Kimberly would tell Father to move in with her to avoid him having to go to a Nursing Home.

43. Because of IQ's conduct, Kimberly is unable to care for her ill father.

44. As a result of IQ's conduct, Kimberly has lost sleep, and spent hours attempting to fix IQ's improper debt collection tactics and communications.

45. As a direct result of IQ's conduct, Kimberly's productivity has declined at work and her relationships with her loved ones has suffered.

46. After facing IQ's ruthless conduct, Kimberly's joy in going to work and pride in being a debt collector has been shaken.

47. As of April 23, 2021, The Consumer Financial Protection Bureau Consumer Complaint Database lists 1,699 Complaints regarding IQ's debt collection methods.

48. A significant portion of these complaints seemingly involve allegations similar to the allegations herein.

49. IQ is aware that its clients' accounts have errors in them prior to placement with IQ.

50. Despite this, IQ's policy and practice in scrubbing accounts placed by its clients does not include any validation of the amount its clients alleged is owed, or the veracity of the debt amounts.

51. Furthermore, upon being told that the debt IQ is collecting upon is improper or unlawful, IQ does not verify the factual claims with its client.

52. Furthermore, upon being offered with factual evidence that substantiates claims of improper collection activity, IQ refuses to examine the evidence and systematically disregards its existence.

53. IQ undertook no verification process in regard to the alleged debt to verify the amount its client was claiming it was owed was lawfully owed.

54. IQ policies and procedures for processing account data received from original creditors fail to identify easily discoverable errors and avoid the needless harassment of undeserving consumers like Kimberly.

55. IQ unreasonably relied upon inaccurate information provided to IQ by IQ's client while it was attempting to collect a debt from Kimberly.

56. In reliance of the representation from IQ that there would be negative consequences if she consulted with an attorney, Kimberly believed that the only way to restore her credit would be to pay off the debt that she did not owe.

57. As such, despite the firm belief that Kimberly owed Apartment Complex and IQ nothing, Kimberly attempted to negotiate ransom for IQ to correct her credit report.

58. Despite Kimberly disputing the debt yet offering to pay something, IQ refused to accept Kimberly's settlement offers.

59. When Kimberly attempts to discuss resolving the alleged debt, IQ has regularly put her on hold for extended periods of time (more than 15 minutes) and has neglected to return her calls despite IQ promising to do so.

60. IQ did not notify the credit bureaus of the dispute.

61. IQ did not notify their client of the dispute.

62. Despite Kimberly's pleas for IQ to remove the tradeline, IQ continues to report the debt on Kimberly's credit report.

63. IQ is, literally, holding Kimberly's life hostage until she agrees pays a debt that is disputed, that is being collected on in violation of Federal Law, and that Kimberly believes she does not owe.

## COUNT ONE

### Violation of the Fair Debt Collection Practices Act

64. Kimberly re-alleges and incorporates by reference Paragraphs 5 through 63 above as if fully set forth herein.

65. IQ violated 15 U.S.C. § 1692c(b) by communicating with a third party in connection with the collection of the debt without Kimberly's consent.

## COUNT TWO

### Violation of the Fair Debt Collection Practices Act

66. Kimberly re-alleges and incorporates by reference Paragraphs 5 through 63 above as if fully set forth herein.

67. In order to establish a violation of Section 1692d of the FDCPA, a consumer need not prove intentional conduct by the debt collector. *See Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2nd Cir. 2010); *Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir. 2013) ("[Plaintiff] points to no evidence in the record regarding [Defendant's] intent, which is just as well, because intent is irrelevant" in a § 1692d claim).

68. "Instead, applying an objective standard, as measured by the 'least sophisticated consumer,' the consumer need only show that the likely effect of the debt collector's communication or

7

conduct could be construed as harassment, oppression or abuse." *See Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 721 (S.D. Tex. 2012).

69. The likely effect of IQ's debt collection efforts, as measured by the "least sophisticated consumer" standard, was "to harass, oppress, or abuse" Kimberly.

70. IQ violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Kimberly in connection with the collection of the debt.

## COUNT THREE

### Violation of the Fair Debt Collection Practices Act

71. Kimberly re-alleges and incorporates by reference Paragraphs 5 through 63 above as if fully set forth herein.

72. A debt collector's intent to violate the FDCPA may be inferred by its maintenance of policies and procedures which, in themselves, violate the FDCPA. *See Anchondo v. Anderson, Crenshaw & Associates, L.L.C.,* 256 F.R.D. 661, 671 (D.N.M. 2009); s*ee also Kromelbein v. Envision Payment Sol., Inc.*, 2013 WL 3947109, *7 (M.D. Penn. Aug. 1, 2013)("company policy can be just as much a violation of [FDCPA] as the rogue act of an individual employee. If anything, a company policy that violates the FDCPA is a more egregious transgression because it indicates endemic, rather than isolated, disregard for debtor rights."); *citing Edwards v. Niagara Credit Sol., Inc.*, 586 F. Supp. 2d 1346, 1354 (N.D. Ga. 2008) (awarding maximum damages in part because conduct was company policy, thereby making it routine and frequent).

73. IQ's policies and procedures, as described in Paragraphs 49 through 55, *supra*, constitutes "conduct the natural consequence of which is to harass, oppress, or abuse" consumers.

74. IQ's practice, therefore, violates Section 1692d of the FDCPA, which provides:

> A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

See 15 U.S.C. §1692d.

75. Because IQ's practice, in itself, violates the FDCPA, it reflects an intent to harass consumers generally.

## COUNT FOUR

### Violation of the Fair Debt Collection Practices Act

76. Kimberly re-alleges and incorporates by reference Paragraphs 5 through 63 above as if fully set forth herein.

77. IQ violated 15 U.S.C. § 1692e by using false, deceptive, or misleading representations or means in connection with the collection of the debt.

## COUNT FIVE

### Violation of the Fair Debt Collection Practices Act

78. Kimberly re-alleges and incorporates by reference Paragraphs 5 through 63 above as if fully set forth herein.

79. IQ violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect the debt.

## JURY DEMAND

80. Kimberly demands a trial by jury.

## PRAYER FOR RELIEF

81. Kimberly prays for the following relief:

    a. Judgment against IQ for actual damages, statutory damages, and costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k.

    b. For such other legal and/or equitable relief as the Court deems appropriate.

                                              RESPECTFULLY SUBMITTED,

Date: April 23, 2021

                                      By:     /s/ Jeffrey S. Hyslip
Jeffrey S. Hyslip, Esq. (OH 0079315)
Hyslip Legal, LLC
1309 Park Street
McHenry, IL  60050
Phone: 614-490-4224
jeffrey@hysliplegal.com